IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 05-30078-WDS |
| | ) | |
| JOEY HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER

**STIEHL, District Judge:**

This matter is before the Court on defendant's motion to suppress evidence and statements (Doc. 12) to which the government has filed a response. The Court held an evidentiary hearing on the motion and took the matter under advisement.

## FACTUAL BACKGROUND

The indictment charges the defendant with firearm and drug violations. Specifically Count 1 charges that on or about April 17, 2003, the defendant, having been previously been convicted of a felony, possessed a .357 caliber firearm in violation of 18 U.S.C. § 922(g)(1). Count 2 charges that on the same date the defendant possessed with intent to distribute 2.1 grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

The government presented the testimony of East St. Louis Police Detective Dan Hill and United States Deputy Marshal Tom Woods. Detective Hill testified that in April of 2003, he was assigned to work with the Operation Outlaw Crime Initiative Task Force in East St. Louis with members of the United States Marshals Service, Belleville Police, Illinois Department of Corrections and St. Clair County Probation office. At approximately 4:00 P.M. on April 17,

2003, Hill and his partner, Detective Ontourio Eiland, in their unmarked car, were patrolling in an area about which they had received several calls for drugs and guns. They had not received any particular calls that day about activity, but were just patrolling the area around the Regal Package Liquor when Detective Hill noticed two black males outside the liquor store who he believed were committing criminal trespass by standing outside the liquor store.

He made a U-turn and pulled in front of the store. Detective Eiland got out of the car, wearing his raid vest marked with "Police," and approached one of the men. The person approached by Det. Eiland was wearing all black. Detective Hill parked the car and joined Detective Eiland. As Hill walked up, Deputy U.S. Marshal Tom Woods asked Hill if he had told the other black male who had been in front of the liquor store to leave. Hill replied that he had not, and Hill and Deputy Woods then yelled at the man walking away to stop. Although they yelled "Stop" several times, the man, the defendant in this case, kept walking away from the liquor store. Detective Hill described the defendant as wearing a hat, a heavy leather jacket, jeans and glasses. He thought the jacket was unusual because it was rather warm (the task force members were all in short sleeves), and Hill was concerned because a long jacket could be used to conceal weapons.

Hill eventually grabbed the defendant's arm, and attempted to handcuff him. The defendant stiffened up and would not remove his right hand from his pocket, despite being asked to do so. Deputy Woods grabbed the defendant's right arm and forcibly removed it from his pocket. Once handcuffed, Hill asked the defendant if he had "anything he shouldn't," to which the defendant replied that he had some crack cocaine in his pocket. Hill reached into the pocket and took out the crack cocaine, and then Deputy Woods asked the defendant if he had "anything else" on him. The defendant did not give an oral reply to Wood's question, but nodded towards

his jacket. Deputy Woods then patted down the defendant and found a gun in his jacket.

The defendant was interviewed on April 18, 2003, by Hill and Deputy U.S. Marshal Dave Davis.  During that interview the defendant told them that he had walked away from the officers on the previous day because he knew he had drugs and a gun, and that, as a felon, he was not supposed to possess a gun.

Deputy Woods testified that as supervisor of the violent crimes initiative, also known as "Operation Outlaw," he is responsible for locating fugitives and also patrols areas where there have been a high number of crime reports.  While in these high crime areas they contact people in the area to see if they can make any arrests.  On April 17, 2003, Deputy Woods was working with the task force, and at approximately 4:00 P.M. he was in the area of 18th Street and State Street in East St. Louis.  He was in that area because the East St. Lois Police Department had received complaints that there was open drug dealing going on around the Regal Package Liquor store.

Deputy Woods noticed several individuals outside of the liquor store, two of whom he believed may have been involved in a drug deal because he saw one person hand something to the other.   His suspicion of illegal activity was based on his experiences investigating drug crimes, and he decided to make contact with the two people in question.  As Deputy Woods got out of his car, he saw Hill and Eiland pulling up to the store and while Det. Eiland approached one man, Deputy Woods tried to approach the defendant.  The defendant, wearing a mid-thigh length leather coat began walking quickly away from the store and the officers. Deputy Woods believed this was to avoid contact with the officers.  Woods asked Hill and Eiland if either of them had told the defendant to leave, but they said they had not.  Woods shouted to the defendant to stop, but he did not do so, even when Hill and Deputy Woods both called out again

for him to stop. The defendant then went around a corner and across a parking lot, and Deputy Woods drew his weapon and took off after the defendant. Detective Hill got to the defendant first, and grabbed his left arm. Woods grabbed the defendant's right wrist, which was in his pocket, to hold it there to make sure he did not have a weapon in that pocket. Woods then forcibly removed the defendant's hand from his pocket, and the defendant was handcuffed at that time. Deputy Woods then walked the defendant to the sidewalk and asked him if he had anything else they needed to be worried about. The defendant said "Yes," and nodded towards his chest. Woods asked him what he had, but the defendant did not reply. He then patted down the defendant and felt what he believed to be a large gun. Woods removed a loaded .357 magnum with wooden grips from the defendant's coat pocket.

The defendant presented evidence that at 4:00 P.M. on April 17, 2003, the temperature was 51.8 degrees, and therefore the defendant had a reason to be wearing a long coat.

## DISCUSSION

It is well settled in the Seventh Circuit that police can conduct a *Terry v. Ohio*, 392 U.S. 1, 21 (1968), stop if they have reasonable suspicion, supported by articulable facts, that criminal activity is occurring. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir.2000). Reasonable suspicion amounts to something less than probable cause but more than a hunch. *Id*. The officer's decision to make the *Terry* stop must have been justified at its inception, and the stop must have been reasonably related in scope to the circumstances known to the officer at the time of the stop. *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir.1996).

It is also well-established that an officer conducting a Terry stop may conduct a protective search of the suspect for the purpose of "the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26. Furthermore, if during a lawful

patdown of a suspect's outer clothing, an officer "feels an object whose contour and mass makes its identity immediately apparent" and "if the object is contraband, its warrantless seizure [is] justified." *Minnesota v. Dickerson*, 508 U.S. 366, 375, (1993). *See, United States v. Jackson*, 377 F.3d 715, 718-19 (7th Cir. 2004).

The circumstances to justify a stop might include the behavior and characteristics of the person detained, as well as the experience of the officer. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir.1995).   A determination of reasonable suspicion "must be based on common-sensical judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  This determination is made based on the "totality of the circumstances presented to the officer at the time of the detention." *United States v. Askew,* 403 F.3d 496, 507 (7th Cir. 2005) (*quoting United States v. Scheets.* 188 F.3d 829, 837 (7th Cir. 1999)). The mere fact that the defendant was in a high crime area is not enough, standing alone, to warrant a *Terry* stop of the defendant. *Wardlow,* 528 U.S. at124-25, but the "courts may consider the defendant's presence in a high crime area as part of the totality of the circumstances confronting the officer at the time of the stop." *United States v. Quinn*, 83 F.3d 917, 922 n.2 (7th Cir. 1996) (*quoted in United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999)).

Here, there was more than enough information to warrant Deputy Woods and Detective Hill approaching the defendant for an investigatory *Terry* stop.  The information they had received included complaints about open drug dealing in a high crime area.   In addition, Deputy Woods observed a hand to hand exchange between the defendant and another male outside the liquor store as they arrived, and believed a drug exchange had just occurred.  As the Seventh Circuit has stated, "a pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement

agents."  *United States v. Lechuga,* 925 F. 2d 1035, 1039 (7th Cir. 1991) (*quoted in Askew*, 403 F.3d at 508).

Having determined, therefore, that the stop of the defendant was reasonable under *Terry*, the court must determine whether the manner of the stop – including stopping the defendant on the street with guns draw – was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Vega,* 72 F.3d 507, 515 (7th Cir. 1995) (*quoted in Askew*, 403 F.3d at 508).  As the court found in *Askew, id.,* "Drug arrests can warrant intrusive tactics because of their inherent danger.  'Guns are among the tools of the drug trade,' *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000), and thus '[a]llowing police to draw their weapons may be reasonable. . . .'" (*quoting United States v. Tilmon,* 19 F.3d 1221, 1227 (7th Cir. 1994).)  Given the fact that the defendant did not respond to the officers' repeated requests to stop; that he was wearing a long jacket that could have been used to hide a weapon; that Deputy Woods had observed what he believed to be a drug exchange; and that drug dealers are often known to carry guns, the Court **FINDS** that the manner of the stop was reasonable under the totality of the circumstances.

## MOTION TO SUPPRESS STATEMENTS

The defendant also seeks to suppress his statements made at the time of his arrest.  As set forth above, the defendant stated, in response to Hill's question of whether he had anything he should not have, that he had crack cocaine on him.  In addition, he responded to Deputy Wood's question about whether he had anything else by stating yes, nodding towards his jacket where he had a gun.  It is well settled that an officer is entitled to "'ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *United States v. Felix-Felix*, 275 F.3d 627, 633 (7th Cir.2001) (quoting

Berkemer v. McCarty, 468 U.S. 420, 439 (1984)). An officer also is entitled "to take reasonable steps to insure [his] own safety." *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir.2002). An officer therefore may conduct a pat-down search of the detainee's outer clothing, *see Jackson*, 300 F.3d at 746. *See United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003). Given the Court's finding that the defendant's stop was based on reasonable suspicion of illegal activity, the questions posed to the defendant were warranted by the circumstances surrounding his flight and brief detention. Therefore, defendant's motion to suppress statements must also fail.

## CONCLUSION

Accordingly, the Court **DENIES** defendant's motion to suppress evidence and statements on all grounds.

**IT IS SO ORDERED.**

**DATED:   August 15, 2005.**


              s/ WILLIAM D. STIEHL
                 **DISTRICT JUDGE**